363 U.S. 121 (1960)
UNITED STATES
v.
FLORIDA ET AL.
No. 10, Original.
Supreme Court of United States.
Argued October 12-15, 1959.
Decided May 31, 1960.
ON MOTION FOR JUDGMENT ON THE PLEADINGS.
Solicitor General Rankin and George S. Swarth argued the cause for the United States. With them on the brief were Oscar H. Davis and John F. Davis.
Senator Spessard L. Holland and Richard W. Ervin, Attorney General of Florida, argued the cause for the State of Florida, defendant. With them on the brief were J. Robert McClure, First Assistant Attorney General of Florida, and Fred M. Burns, Robert J. Kelly and Irving B. Levenson, Assistant Attorneys General.
MR. JUSTICE BLACK delivered the opinion of the Court.
This controversy involves the interests of all five Gulf StatesFlorida, Texas, Louisiana, Mississippi and Alabama in the submerged lands off their shores. The Court heard the claims together, but treats them in two opinions. This opinion deals solely with Florida's claims. The result as to the other States is discussed in one opinion, ante, p. 1. All the claims arise and are decided under the Submerged Lands Act of 1953.[1]
The Act granted to all coastal States the lands and resources under navigable waters extending three geographical miles seaward from their coastlines. In addition *122 to the three miles, the five Gulf States were granted the submerged lands as far out as each State's boundary line either "as it existed at the time such State became a member of the Union," or as previously "approved by Congress," even though that boundary extended further than three geographical miles seaward. But in no event was any State to have "more than three marine leagues into the Gulf of Mexico."[2] This suit was first brought against Louisiana by the United States, United States v. Louisiana, 350 U. S. 990, invoking our original jurisdiction under Art. III, § 2, cl. 2, of the Constitution, to determine whether Louisiana's boundary when it became a member of the Union extended three leagues or more into the Gulf, as Louisiana claimed, so as to entitle it to the maximum three-league grant of the Submerged Lands Act. After argument on the Government's motion for judgment against Louisiana, we suggested that the interests of all the Gulf States under the Act were so related, "that the just, orderly, and effective *123 determination" of the issues required that all those States be before the Court. United States v. Louisiana, 354 U. S. 515, 516. All are now defendants, each has claimed a three-league boundary and grant, which the United States denies, and the issues have been extensively briefed and argued by the parties. As stated, this opinion deals only with the United States-Florida controversy.
Florida contends that the record shows it to be entitled under the Act to a declaration of ownership of three marine leagues of submerged lands, because (1) its boundary extended three leagues or more seaward into the Gulf when it became a State, and (2) Congress approved such a three-league boundary for Florida after its admission into the Union and before passage of the Submerged Lands Act. Since we agree with Florida's latter contention, as to congressional approval, we find it unnecessary to decide the boundaries of Florida at the time it became a State.
Florida claims that Congress approved its three-league boundary in 1868, by approving[3] a constitution submitted to Congress as required by a Reconstruction Act passed March 2, 1867. 14 Stat. 428. That constitution carefully described Florida's boundary on the Gulf of Mexico side as running from a point in the Gulf "three leagues from the mainland" and "thence northwestwardly three leagues from the land" to the next point.[4] The *124 United States concedes that from 1868 to the present day Florida has claimed by its constitutions a three-league boundary into the Gulf.[5] The United States also admits that Florida submitted this constitution to Congress in 1868, but denies that the Gulf boundary it defined was "approved" by Congress within the meaning of the Submerged Lands Act.[6] This is the decisive question as between Florida and the United States.
The 1868 Florida Constitution was written and adopted by Florida pursuant to the congressional Act of March 2, 1867[7] as supplemented by a second Act of March 23, 1867.[8] These Reconstruction Acts purported "to provide for the more efficient Government of the Rebel States," including Florida. The States involved were divided into military districts and subjected to strict military authority. Detailed provisions were made for registration of voters, election of delegates to constitutional conventions, the framing of constitutions "in conformity with the provisions" of these Reconstruction Acts, and submission of the constitutions to the people of those States for their ratification and approvalall under the supervision and control of commanding generals. Constitutions so adopted were then to be "submitted to Congress for examination and approval," after which approval by Congress and after ratification of the Fourteenth Amendment by each State, each should be "declared entitled to representation in Congress." Florida's Constitution was written, *125 considered and voted upon in the State in accordance with these statutory directions and under the eye and control of an Army general. When submitted to Congress it was much debated, and thereafter on June 25, 1868, another Act was passed authorizing the admission of Florida and other Southern States "to Representation in Congress."[9] 15 Stat. 73. The preamble to this "Admission Act" declared that these States had adopted their constitutions "in pursuance of the provisions" of the 1867 Acts, which Acts, as has been pointed out, required "examination and approval" of the constitutions as a prerequisite to readmission of congressional representation. Thus by its own description, Congress not only approved Florida's Constitution which included three-league boundaries, but Congress in 1868 approved it within the meaning of the 1867 Acts. In turn, the approval the 1867 Acts required appears to be precisely the approval the 1953 Act contemplates.
The Government argues, however, that these readmission enactments did not contemplate and Congress did not make a general scrutiny of all the provisions of the state constitutions, but only that the constitutions had been duly adopted and were republican in form. The Government makes many references to debates which indicated that some Senators and Congressmen were satisfied with such a limited examination of the constitutions.[10] Florida, on the other hand, points out many *126 other remarks which indicated a much closer examination of the state constitutions.[11]
It is beyond doubt that the proposed constitutions were printed, then read, discussed, and amended in the Congress. For instance, the very 1868 bill that admitted Florida's congressional representatives contained a proviso rejecting certain parts of the Georgia Constitution.[12] That at least some Congressmen scrutinized the constitutions to see if amendments were necessary is persuasively shown by the remarks of Congressman Thaddeus Stevens, set out below.[13] Mr. Stevens was Chairman of the *127 all-important Joint Committee on Reconstruction, and, because of his leading role as architect of the reconstruction plan finally adopted and carried out by Congress, has appropriately been called "the Father of the Reconstruction."[14]
The voluminous references to the Reconstruction debates fail to show us precisely how closely the Southern States' Reconstruction Constitutions were examined. We cannot know, for sure, whether all or any of the Congressmen or Senators gave special attention to Florida's boundary description. We are sure, however, that this constitution was examined and approved as a whole, regardless of how thorough that examination may have been, and we think that the 1953 Submerged Lands Act requires no more than this. Moreover, the Hearings and the Reports on the Submerged Lands Act show, as the Government's brief concedes, that those who wrote into that measure a provision whereby a State was granted up to three leagues if such a boundary had been "heretofore approved by Congress," had their minds specifically focused on Florida's claim based on submission of its 1868 Constitution to Congress. When Florida's claims were mentioned in the hearings it was generally assumed that Congress had previously "approved" its three-league *128 boundaries.[15] The Senate Report on a prior bill, set forth as a part of the report on the 1953 Act, pointed out that "In 1868 Congress approved the Constitution of Florida, in which its boundaries were defined as extending 3 marine leagues seaward and a like distance into the Gulf of Mexico." S. Rep. No. 133, 83d Cong., 1st Sess. 64-65.[16] The language of the Submerged Lands Act was at least in part designed to give Florida an opportunity to prove its right to adjacent submerged lands so as to remedy what the Congress evidently felt had been an injustice to Florida. Upon proof that Florida's claims met the statutory standard"boundaries . . . heretofore approved by the Congress"the Act was intended to "confirm" and "restore" the three-league ownership Florida had claimed as its own so long and which claim this Court had in effect rejected in United States v. Texas, 339 U. S. 707; United States v. Louisiana, 339 U. S. 699; and United States v. California, 332 U. S. 19. As previously shown, Congress in 1868 did approve Florida's claim to a boundary three leagues from its shores. And, as we have held, the 1953 Act was within the power of *129 Congress to enact. Alabama v. Texas, 347 U. S. 272. See also United States v. California, 332 U. S. 19, 27.
We therefore deny the United States' motion for judgment. We hold that the Submerged Lands Act grants Florida a three-marine-league belt of land under the Gulf, seaward from its coastline, as described in Florida's 1868 Constitution. The cause is retained for such further proceedings as may be necessary more specifically to determine the coastline, fix the boundary and dispose of all other relevant matters. The parties may submit an appropriate form of decree giving effect to the conclusions reached in this opinion.
It is so ordered.
THE CHIEF JUSTICE and MR. JUSTICE CLARK took no part in the consideration or decision of this case.
MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, concurring.[]
Considering the variety of views evoked by these cases, I deem it appropriate to add a few words to the two Court opinions which I have joined.
The one thing which I take to be incontestable is that Congress did not, by the Submerged Lands Act of 1953, make an outright grant to any of the Gulf States in excess of three miles. Congress only granted to each of these States the opportunity to establish at law that it possessed a boundary in excess of three miles, either by virtue of possession of such a boundary at the time of its admission to the Union or by virtue of congressional "approval" of such a boundary prior to the enactment of the Submerged *130 Lands Act. A Gulf State that can successfully establish such a judicially ascertainable fact is entitled to a grant of the submerged lands beyond three miles to a distance of the lesser of three leagues or of the boundary so established. Congress, in the Submerged Lands Act itself, did not determine the existence of a boundary for any State beyond three miles, either explicitly or by implied approval of a claim presented to it in the course of the legislative process. Nor of course did Congress vest this Court with determination of a claim based on "equity" in the layman's loose sense of the term, for it could not. Congress may indulge in largess based on considerations of policy; Congress cannot ask this Court to exercise benevolence on its behalf.
There is no foundation in the Act of 1953 or its legislative history for the view that particularized, express approval of a State's boundary claim by a prior Congress is required to make a defined boundary the measure of the grant. To the contrary, in the case of Florida, authoritative legislative history makes it perfectly clear that the very question deliberately preserved by the Act of 1953 was whether congressional approval of the new Florida Constitution in the Reconstruction legislation of 1867-1868, by which Florida was restored to full participation in the Union, amounted to an approval of the three-league boundary which that constitution explicitly set forth.[*] *131 I sustain Florida's claim because I find that its boundary was so approved.
The proper construction of the effect of congressional "approval" of the Florida Reconstruction constitution presents problems quite different from those stirred by the constitutional controversy and its resulting problems that are compendiously known as Reconstruction. See Lincoln's last public address, April 11, 1865. 8 Basler, The Collected Works of Abraham Lincoln, 399. The readjustment of the relationship between the States that had remained in the Union and those that had seceded presented major issues not only for the political branches of the Government, the President and the Congress, but also for this Court. Insofar as the perplexing and recalcitrant problems of Reconstruction involved legal solutions, the evolution of constitutional doctrine was an indispensable element in the process of healing the wounds of the sanguinary conflict. It was in aid of that process that this Court formulated the doctrine expressed in the *132 famous sentence in Texas v. White: "The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." 7 Wall. 700, 725.
This theory served as a fruitful means for dealing with the problems for which it was devised. It is unrelated to the question now before us, namely, whether, when it "approved" as an entirety the Florida Constitution as a condition to the recognition of that State's full membership in the Union, Congress exercised its undoubted power to approve the seaward boundary claim contained within it. It is in essence the contention of the United States that approval could only have been manifested explicitly, that Congress must have ratified the boundary provision in so many words, either expressly in the Reconstruction Acts, or by an authoritative gloss upon them in a committee report or a speech on the floor by a responsible chairman. But in these matters we are dealing with great acts of State, not with fine writing in an insurance policy. Florida was directed to submit a new constitution for congressional approval as a prerequisite for the exercise of her full rights in the Union of States and the resumption of her responsibilities. In this context it would attribute deceptive subtlety to the Congresses of 1867-1868 to hold that it is necessary to find a formal, explicit statement by them, whether in statutory text or history, that the boundary claim, as submitted in Florida's new constitution, was duly considered and sanctioned, in order to find "approval" of that claim.
MR. JUSTICE HARLAN, dissenting.
It is with regret that I find myself unable to agree that Florida has made a case for "three-league" rights under the Submerged Lands Act. As shown in the Court's opinion relating to the other States involved in the litigation (ante, pp. 16-36), a state seaward boundary satisfying *133 the requirements of the Submerged Lands Act must be one which by virtue of Congressional action would have been legally effective to carry, as between State and Nation, submerged land rights under the Pollard rule, as Congress conceived that rule to have been prior to this Court's decision in the California case, 332 U. S. 19. That test supplies the meaning and content not only of the phrase "boundaries . . . as they existed at the time such State became a member of the Union," but also of the phrase "boundaries . . . as heretofore approved by Congress," contained in § 2 of the Submerged Lands Act (ante, p. 9, note 7). Florida must satisfy that test if it is to prevail in this case.
The Court's Florida opinion conceives the issue to be whether Congress in 1868 made a "general scrutiny of all the provisions of" Florida's Constitution, and states that the Submerged Lands Act requires only that it have been "examined and approved as a whole." The concurring opinion asserts that the relevant inquiry is "whether congressional approval of the new Florida Constitution . . . amounted to an approval of the three-league boundary which that constitution explicitly set forth." In my view, neither formulation adequately characterizes the nature of the question left by the Submerged Lands Act to this Court. It may be conceded that Congress scrutinized all the provisions of Florida's Constitution and that by accepting the Constitution it, in an abstract sense, approved the boundary provision. The further and controlling inquiry that must be made is whether the legal effect of such action was to establish a valid three-league boundary for Florida. If not, Florida would not have owned the submerged lands to that distance under Congress' concept of the Pollard rule, and it would therefore be entitled to no better rights under the Submerged Lands Act. On neither branch of its claims do I believe that Florida's showing measures up to that standard.

*134 I.
My difficulty with Florida's "readmission" claim begins with the proposition that a State relying on a readmission boundary stands on quite a different legal footing than one relying on an original admission boundary. In the latter instance the fixing of a boundary is a necessary incident of Congress' power to admit new States. A newly admitted State, in the absence of an express fixation of its boundary by the Congressional act of admission or an articulated rejection of its preadmission boundary, may, I think, rely on a presumed Congressional purpose to adopt whatever boundary the political entity had immediately prior to its admission as a State.[1] That would seem to be the effect of New Mexico v. Colorado, 267 U. S. 30, and New Mexico v. Texas, 275 U. S. 279, 276 U. S. 557.[2]
Different considerations, however, obtain in the case of a State readmitted to "representation in Congress" after the Civil War. Such a State renounced the Union with boundaries already fixed by Congress at the time of original *135 admission. When it was restored to full participation in the Union, there is no reason to suppose its territorial limits would not remain the same. So much indeed finds sound support in the constitutional doctrines evolved in the so-called reconstruction cases, even though they related to different problems arising out of the Civil War. See Texas v. White, 7 Wall. 700, 726; White v. Hart, 13 Wall. 646, 649-652; Gunn v. Barry, 15 Wall. 610, 623; Keith v. Clark, 97 U. S. 454, 461. Since, as will be shown later (post, pp. 140-141), Florida renounced the Union with a seaward boundary no greater than three miles, the issue here is whether upon readmission Congress changed that boundary to three leagues. Unlike the situation at original admission, where the necessity of fixing some boundary for a newly admitted State leads readily to the presumption of Congressional approval of a tendered preadmission boundary, no similar presumption arises in connection with an alleged change in a state boundary already fixed by Congress.
After a painstaking examination of the legislative materials I can find no evidence whatever that the Congress intended to change Florida's seaward boundary from one not in excess of three miles to one of three leagues when the State was readmitted to representation in 1868. Certainly the Act of readmission (Act of June 25, 1868, 15 Stat. 73), upon which Florida relies, affords no basis for a claim that Congress expressly approved the State's three-league boundary provision.[3] The statute refers in *136 no way to boundaries; it does not even undertake to approve Florida's Constitution, let alone the boundaries described therein; and it is entitled merely as "An Act to admit . . . Florida, to Representation in Congress," not as an act to admit it to the Union. Cf. White v. Hart, supra, at 652.[4]
*137 Nor can I find any basis in the legislative record for a conclusion that Congress impliedly changed Florida's boundary. The Congressional debates and reports may be searched in vain for a single referenceeven a casual oneto the boundaries of any of the readmitted States. The preamble of the Act of June 25, 1868, and the Congressional debates affirmatively show that all with which Congress was concerned was whether the constitutions of the readmitted States had been validly adopted and were republican in structure, and, in a few instances, whether they contained provisions in palpable violation of the Federal Constitution.[5] No territorial questions at all appear to have figured in the debates. In these *138 circumstances the case of Virginia v. Tennessee, 148 U. S. 503, upon which Florida relies in support of its argument as to implied approval, is quite inapposite. There the two States had made a compact with respect to the boundary between them. Subsequently Congress adopted the line so established in setting up districts for judicial, revenue, election, and appointive purposes. It was held that Congress had thereby impliedly approved the interstate compact. Id., 521-522. In the present instance we have no affirmative action by Congress respecting the 1868 proffered Florida boundary in any way comparable to that in this earlier case.
Nor can a purpose to change Florida's boundary be inferred from the bare context of the Congressional action. The constitutional area in which the Congress was moving in 1868 should not be forgotten. Congress was not undertaking to exercise its power to fix state boundaries incident to the admission of new States. Rather, it was engaged in "re-establishing the broken relations of the State[s] with the Union," and in satisfying itself that the constitutions of the States lately in rebellion had been validly adopted and were republican in form, all pursuant to Congress' constitutional obligation to guarantee to each State a republican form of government. See Texas v. White, supra, 727-728. This is not to say that Congress could not at the same time have changed any State's original admission boundary, but only to raise the question whether it in fact did so. While the exercise of a particular constitutional power does not of course preclude resort to others, the nature of the power exerted in 1868 does seem to me to negative the idea that Congress also purported to exercise its power to change Florida's boundary.[6]
*139 In the last analysis I think that Florida's claim here could only be sustained on the view that Congress was under a duty to speak with reference to the State's boundary provision, failing which Congress' silence should as a matter of law be deemed the equivalent of acceptance of the provision. In light of factors already adverted to I cannot perceive how such a duty could be found to exist. To uphold Florida's claim on any such theory would be novel doctrine indeed, particularly where property rights of the United States are involved. Cf. United States v. California, supra, at 39-40. Moreover, to say that such a duty existed seems to me to misconceive the nature of the "approval" of the constitutions of the seceded States contemplated by the reconstruction statutes. Such approval was not of the sort involved in the case of a constitution submitted to a constitutional convention for adoption or ratification, where the failure to reject a particular provision would be equivalent to its acceptance. Instead, the whole tenor of the reconstruction debates clearly shows that all that was meant by "approval" was that before any seceded State was restored to representation, Congress must be satisfied that its constitution had been properly adopted and was republican in its general structure. That kind of a requirement of "approval" does not lend itself to the conclusion that this Court would be attributing to the 1868 Congress a "deceptive subtlety" unless it regards silence upon Florida's boundary provision as tantamount to its acceptance. Especially so, when that provision was quite outside the realm of matters upon which Congress *140 had been called upon to act. "Great acts of State" these events of the reconstruction period were indeed, but I do not think they can now be taken as having encompassed acceptance of the territorial pretensions of any particular State.
In sum, I believe the conclusion inescapable that all that Congress can properly be taken to have done in readmitting Florida was to declare that nothing in the State's new constitution disqualified its Senators and Representatives from taking their seats in Congress. While such action may in some abstract sense have constituted "approval" of Florida's boundary provision, since it was included in its constitution, in my opinion it did not represent the sort of advertent, affirmative Congressional action which legally would have been necessary to effectuate an actual change in Florida's original admission boundary. It therefore did not "approve" Florida's three-league boundary within the only sense contemplated by the Submerged Lands Act.

II.
It is clear that the State fares no better on its alternative claim, based upon its original admission boundary. Since the Court does not reach this claim, it will be enough to state briefly the reasons which require its rejection.
The territory which now comprises the State of Florida was originally acquired by England from France and Spain by the Treaty of Paris of February 10, 1763.[7] By the proclamation of October 7, 1763,[8] King George III divided the acquired territory into East and West Florida. East Florida was declared to be "bounded to the westward *141 by the Gulf of Mexico and the Apalachicola river . . . and to the east and south by the Atlantic ocean and the gulf of Florida, including all islands within six leagues of the sea coast." West Florida was declared to be "bounded to the southward by the gulf of Mexico, including all islands within six leagues of the coast, from the river Apalachicola to Lake Pontchartrain . . . ."
By the Treaty of Versailles of September 3, 1783, England ceded to Spain the territory described merely as "East Florida, as also West Florida."[9] By the Treaty of Amity, Settlement, and Limits of February 22, 1819, Spain ceded to the United States "all the territories which belong to [Spain], situated to the eastward of the Mississippi, known by the name of East and West Florida."[10] Both the Act establishing Florida as a Territory,[11] and the Act admitting it to the Union,[12] describe it in terms of the territories of East and West Florida ceded by the Treaty of 1819.
Florida contends that the provision in King George's proclamation relating to all islands within six leagues of the coast was an assertion of a territorial boundary at that distance along the entire coast, and that subsequent conveyances necessarily incorporated that description. The opinion of the Court relating to Louisiana, Mississippi, and Alabama disposes of that contention (ante, pp. 66-82), and what has been said there need not be repeated here.
*142 Florida also relies on many of the same treaties as does Louisiana to show that this country's predecessors in title claimed large amounts of territorial sea. Without elaborating on what has already been said (ante, pp. 73-74), it is sufficient to point out here that these treaties did not constitute territorial assertions, but merely established obligations between the parties of a special and limited nature, and varied so widely in the distances specified as not to be of any value whatever in showing a uniform practice.
I would grant the Government's motion for judgment as to Florida.
NOTES
[1] 67 Stat. 29, 43 U. S. C. §§ 1301-1315.
[2] 43 U. S. C. § 1301 (a) (2), (b). Section 1301 (b) provides: "The term `boundaries' includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico . . . as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, . . . but in no event shall the term . . . be interpreted as extending from the coast line more than . . . three marine leagues into the Gulf of Mexico." Section 1311 (a) provides: "It is . . . declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States . . . be, and they are, . . . recognized, confirmed, established, and vested in and assigned to the respective States . . . ." And § 1312 provides: "The seaward boundary of each original coastal State is approved and confirmed as a line three geographical miles distant from its coast line . . . . Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress."
[3] The Florida Constitution of 1868, 25 Fla. Stat. Ann. 411, 413, was considered by Congress along with the constitutions of North Carolina, South Carolina, Louisiana, Georgia and Alabama in an Act of June 25, 1868, readmitting those States to "representation in Congress." 15 Stat. 73.
[4] The Florida boundary described in Article I of that State's 1868 Constitution provided in relevant part: ". . . thence southeastwardly along the [Atlantic Ocean] coast to the edge of the Gulf Stream; thence southwestwardly along the edge of the Gulf Stream and Florida Reefs to and including the Tortugas Islands; thence northeastwardly to a point three leagues from the mainland; thence northwestwardly three leagues from the land, to a point west of the mouth of the Perdido river; thence to the place of beginning." (Emphasis supplied.)
[5] The Florida Constitution of 1885, 25 Fla. Stat. Ann. 449, is that State's current constitution. Language identical to that set forth above, note 4, supra, provides, in the present Article I, for the same three-league boundary described in 1868. Id., 717.
[6] See note 2, supra.
[7] 14 Stat. 428.
[8] 15 Stat. 2.
[9] Debates on the 1868 Act, including discussions of the constitutions of the States to be readmitted to representation in Congress, are reported at Cong. Globe, 40th Cong., 2d Sess. 2412-2413, 2445-2456, 2461-2466, 2498-2499, 2858-2860, 2861-2872, 2895-2900, 2901-2904, 2927-2935, 2963-2970, 2998-3022, 3023-3029, 3052, 3090-3097, 3466, 3484-3485, App. 314-316, 329-338, 347-354.
[10] See, e. g., the remarks of Senator Sherman. "When we go beyond securing the enforcement of the guaranty of republican government, which we have the power to do, when we undertake to legislate for them upon matters on which they have passed, we transcend our bounds." Cong. Globe, 40th Cong., 2d Sess. 2969. Senator Williams said: "If I understand the reconstruction laws, it is not necessarily the duty of Congress to revise the constitution of every one of these States . . . [otherwise] we might just as well have made these constitutions at the beginning and sent them down there with instructions to the people to adopt them as the constitutions of the several States." Id., 2999.
[11] In opposing the inclusion of Florida in the Readmission bill, Congressman Paine, a member of the powerful Reconstruction Committee, said: "[I]t has been my duty as a member of the committee to scrutinize this constitution. I ought to explain to the House its character. After I have done that it will be for each member to decide himself whether he will or will not vote for concurrence." Cong. Globe, 40th Cong., 2d Sess. 3091. See also discussion concerning the Arkansas Constitution, note 13, infra.
[12] 15 Stat. 73. As to this action a Congressman said: "With a microscopic view the Committee on Reconstruction, or a majority of them, have looked into the details of the constitution of Georgia, and propose to strike out of it certain provisions." (Emphasis supplied.) Cong. Globe, 40th Cong., 2d Sess. 3094.
[13] "Now, all I have to say is this: this constitution of Arkansas has been before us for four weeks, fairly printed. . . . I think that this constitution is above all suspicion, and I am a little scrupulous and particular about any constitution I am called upon to vote for. Now, with a constitution with which I can find no fault, after it has been so long before us, I cannot for a moment conceive that there has not been time enough allowed for all of us to become acquainted with it. And as in equity that is presumed to be done which should be done, which ought to be done, therefore it is to be presumed that there is not a man in this House who does not know all about this constitution." (Emphasis supplied.) Cong. Globe, 40th Cong., 2d Sess. 2399. Congressman Stevens was here referring to one State, Arkansas, 500 copies of whose constitution were printed for use of the members of the House of Representatives, Cong. Globe, 40th Cong., 2d Sess. 2333, 2372. The record shows that Florida's Constitution was referred to the Committee on Reconstruction and copies were printed for the use of the House. The congressional history indicates that all the constitutions were given equally close attention.
[14] Brodie, Thaddeus Stevens (1959), 371. See also 17 Dictionary of American Biography (1935), 620, 624, and biographies cited at 625.
[15] "Senator LONG. When Congress approved the constitution of the State of Florida, fixing Florida's boundary on the Gulf side 3 leagues out into the sea, could there be any doubt in your mind that Congress in effect said to Florida that your boundary goes out 3 leagues and agreed to it? That certainly is not a unilateral act, is it?" Hearings before Senate Committee on Interior and Insular Affairs on S. J. Res. 13, S. 294, S. 107, S. 107 amendment, and S. J. Res. 18, 83d Cong., 1st Sess. 317. See also id., 323 and 326 for remarks that in 1868 "Congress approved" Florida's boundary, and 931 for Attorney General Brownell's acknowledgment that Florida's west coast would not be limited to the general three-mile line.
[16] At pages 21-23 of this report may be found a legislative history of the submerged lands controversy. Appendix E, the Report of the Senate Judiciary Committee on the prior bill, contains further helpful background material.
[] [NOTE: This opinion applies also to United States v. Louisiana et al., ante, p. 1.]
[*] For example, Senator Holland, the Senator from Florida, stated, in response to questioning on the precise issue:

"I have never contended in this debate, or anywhere else, for a 3-league limitation in the case of my State, except as fixed by its constitution and except as approved, I believe, by the Congress.
"If the Senator does not think we have a case which we can establish in court, why is he concerned about it? I am perfectly willing to rely upon that 3-league limit on our Gulf Coast, as stated in the Florida Constitution and as approved by the Congress, so I believe, in 1868.
"So it is very difficult for me to understand why those who oppose the pending joint resolution feel that there is something to fear, if they feel we have no firm case for that boundary. We do not spell out that firm case in the pending measure. In this measure we simply claim the right . . . to showif it be a factthat we have a greater border than 3 miles, as we claim, in the Gulf of Mexico.
"Likewise we claimand to come under this measure we would have to establish that claimthat that 3-league border was not only provided in our constitution, and is still there, but that it was approved when our constitution was approved by act of Congress.
"So if the Senator thinks that any link in that chain is unsafe and insecure, that should make him believe that Florida will not have the claimed 3-league boundary . . . .
"I am beginning to believe that my friends are fairly well convinced of the strength of the action taken by Congress, and are afraid that Florida does have a legal and a supportable claim to the 3-league boundary, because if the case were as weak as some Senators seem to believe it is, why would they be disturbed by the general wording of the pending joint resolution, which simply gives Florida its day in court?" 99 Cong. Rec. 2923.
[1] More is required of Texas in this case because of the manner in which the Joint Resolution admitting Texas to the Union was drawn. See the Court's opinion relating to the other States, ante, pp. 44-47.
[2] In both cases, the description of the boundary fixed for the State by the event of admission was agreed uponthe 37th parallel in the Texas case, and the middle of the channel of the Rio Grande in the Colorado case. The actual physical location of those respective boundaries, however, was in dispute. In the former, the Court held that the location of the boundary was fixed by the event of admission in accordance with a survey of the 37th parallel which had been theretofore made, even though it might not have been a correct survey. In the latter case, it held that since the location of the Rio Grande's channel in 1850 had been continuously accepted as the location of New Mexico's boundary prior to statehood, and had been so specified in its constitution when admitted to the Union, that became the location of the State's boundary.
[3] In pertinent part the Act reads:

"WHEREAS the people of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida have, in pursuance of the provisions of an act entitled `An act for the more efficient government of the rebel States,' passed March second, eighteen hundred and sixtyseven, and the acts supplementary thereto [see note 4, post], framed constitutions of State government which are republican, and have adopted said constitutions by large majorities of the votes cast at the elections held for the ratification or rejection of the same: Therefore,
"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That each of the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, shall be entitled and admitted to representation in Congress as a State of the Union when the legislature of such State shall have duly ratified the amendment to the Constitution of the United States proposed by the Thirty-ninth Congress, and known as article fourteen, upon the following fundamental conditions: That the constitutions of neither of said States shall ever be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote in said State, who are entitled to vote by the constitution thereof herein recognized, except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State: Provided, That any alteration of said constitution may be made with regard to the time and place of residence of voters; and the State of Georgia shall only be entitled and admitted to representation upon this further fundamental condition: that the first and third subdivisions of section seventeen of the fifth article of the constitution of said State, except the proviso to the first subdivision, shall be null and void, and that the general assembly of said State by solemn public act shall declare the assent of the State to the foregoing fundamental condition."
[4] Reliance is placed on the Act of March 2, 1867, 14 Stat. 428, providing for a State's readmission when, among other things, its "constitution shall have been submitted to Congress for examination and approval, and Congress shall have approved the same . . . ." I find nothing in this provision, or in those of any of the other so-called reconstruction legislation, Act of March 23, 1867, 15 Stat. 2; Act of July 19, 1867, 15 Stat. 14; Act of March 11, 1868, 15 Stat. 41, which warrants the conclusion that the constitutions of the readmitted States were to be "approved" by Congress, except in the sense that Congress must be satisfied that they had been duly adopted and were republican in form.
[5] The following excerpts from the Congressional debates are typical of many others: "Now, sir, what is the particular question we are considering? Five or six States have had submitted to them the question of forming constitutions for their own government. They have voluntarily formed such constitutions, under the direction of the Government of the United States. They have sent those constitutions here . . . . We have looked at them; we have pronounced them republican in form; and all we propose to require is that they shall remain so forever. Subject to this requirement, we are willing to admit them into the Union." Representative Stevens of Pennsylvania, Cong. Globe, 40th Cong., 2d Sess. 2465.

"All previous fundamental conditions imposed upon a State being admitted into the Union have been upon one of two grounds, either that the clause in the State constitution objected to was in violation of the Constitution of the United States, or that it affected some great, material right, without which the government would not be republican in form. . . .
.....
"When we go beyond securing the enforcement of the guaranty of republican government, which we have the power to do, when we undertake to legislate for them upon matters on which they have passed, we transcend our bounds." Senator Sherman of Ohio, Cong. Globe, 40th Cong., 2d Sess. 2968, 2969.
[6] In passing the Submerged Lands Act, Congress seems to have assumed that it has always had the power so to change a State's boundary, provided the State consents. For purposes of this case, we need not stop to inquire as to the source of the assumed power. It is sufficient to say that, whatever may be the power of Congress to change boundaries as a general matter, Congress clearly has the power to change boundaries, with a State's consent, to the extent that such a change affects only the exercise of property rights as between State and Nation.
[7] 15 Parliamentary History of England 1291, 1296, 1301.
[8] 2 White, A New Collection of Laws, Charters and Local Ordinances of Great Britain, France and Spain (1839), 292.
[9] 39 Journal of the House of Commons 722, 723.
[10] 8 Stat. 252, 254. The Treaty also provided: "The adjacent islands dependent on said provinces, all public lots and squares, vacant lands, public edifices, fortifications, barracks, and other buildings, which are not private property, archives and documents, which relate directly to the property and sovereignty of said provinces, are included in this article."
[11] 3 Stat. 654.
[12] 5 Stat. 742.