Snyder, Appellee, *v.* Motorists Mutual Ins. Co., Appellant.

(No. 5551—Decided March 17, 1965.)

*Mr. R. C. Norris,* for appellee.
*Messrs. Olds & Olds,* for appellant.

DOYLE, J.   In this action commenced in the Court of Common Pleas of Summit County for damages based upon a policy of insurance, a judgment was entered on the verdict of a jury in favor of the boat owner, Harvey J. Snyder (plaintiff-appellee), and against the Motorists Mutual Insurance Company (defendant-appellant), which company had issued its policy of insurance covering damage to the boat and loss to the owner occurring "within the limits of the continental United States of America * * *."

The main issue before this court is whether the trial court erred in charging the jury, as a matter of law, that the loss in damages to the sunken boat occurred within the limits of the continental United States of America.

It appears from the evidence that on March 8, 1960, Snyder was engaged in the sport of fishing from his boat in the Atlantic Ocean off the Florida Keys, when the craft capsized. The geographical point of mishap was located as being approximately four nautical miles from the center of Bahia Honda bridge, and three and six-tenths miles from the nearest shore line, and in a part of the ocean having a water depth of approximately thirty-one feet.

In the appeal from the judgment against it, the Insurance Company urges the following assignments of error, which are declared to be of a prejudicial character and to require a reversal of the judgment:

"(1) The court erred in overruling motions of the defendant for directed verdict at the close of the plaintiff's evidence and at the close of all of the evidence.

"(2) The court erred in charging the jury as a matter of law that the loss upon which this case was based occurred within the continental United States.

"(3) The court erred in overruling the motion of the defendant for judgment following and notwithstanding the verdict of the jury.

"(4) The court erred in overruling the motion of the defendant for a new trial.

"(5) The judgment of the court is contrary to law."

The Insurance Company claims that a point in the ocean beyond three nautical miles from the coast line is not within the continental limits of the United States, as that language is used in the policy of insurance.

In our research of the questions in this case, we have been unable to find a reported decision of any reviewing court in the country defining the contract limitation provision before us, although the limitation of risk as to place appears in a number of standard contract forms.

From decided cases in this state, and elsewhere, however, the following general rules governing the interpretation of insurance contracts may be deduced:

1. A contract of marine insurance must be given a fair and reasonable interpretation to cover the risks anticipated by the parties;

2. The contract is strictly construed against the insurer and favorable to the insured;

3. Where several interpretations are reasonably possible, that which will favor the insured will be adopted;  .

4. Ambiguities in the policy will be resolved against the insurance company, so as to give effect to the dominant purpose of the contract; and

5. If an insurance company, in issuing a marine policy, desires to limit or restrict the operation of the general provisions of its contract by limiting its risk as to place, it should do so in clear and unmistakable language.

From early times, it has been recognized that the sovereignty of nations bordering the seas does not stop at the shoreline, but that for some distance it extends over and under the ocean. Grotius declared, in "The Law of War and Peace," Book II, Chapter 3, Sections 13-14, that territorial rights extended over as much of the sea as could be defended from the shore.

A Dutch Judge, Bynkershoek, in his treatise, "De dominio Maris," (1702), wrote: "Wherefore on the whole it seems a better rule that the control of the land (over the sea) extends as far as cannon will carry; for that is as far as we seem to have both command and possession. I am speaking, however,

of my own times, in which we have these engines of war; otherwise, I should have to say in general terms that the control of the land ends where the power of men's weapons ends; for it is this, as we have said, that guarantees possession." International Law—Cases and Materials, by William W. Bishop, Jr., 375.

In succeeding generations, scholars and writers frequently tended to equate the distance of a cannon shot with one league or three nautical miles. (Statute or land mile—5280 feet; international nautical mile—6,076.10333 feet.)

On November 8, 1793, Thomas Jefferson, in his capacity as Secretary of State of the United States, wrote the British Minister as follows:

"The President of the United States, thinking that, before it shall be finally decided to what distance from our shore lines the territorial protection of the United States shall be exercised, it will be proper to enter into friendly conferences and explanations with the powers chiefly interested in the navigation of the seas on our coasts, and relying that convenient occasions may be taken for these hereafter, finds it necessary in the meantime to fix provisionally on some distance for the present government of these questions. You are sensible that very different opinions and claims have been heretofore advanced on this subject. The greatest distance to which any respectable assent among nations has been at any time given, has been the extent of the human sight, estimated at upwards of twenty miles, and the smallest distance, I believe, claimed by any nation whatever, *is the utmost range of a cannon ball,* usually stated at one league. Some intermediate distances have also been insisted on, and that of three sea leagues has some authority in its favor * * *." 1 Moore's Digest of International Law, 702, 703.

In, connection with this letter, it may be observed that Thomas Jefferson, when President of the United States, stated to John Quincy Adams, in connection with a claimed act of hostility by a French privateer near Charleston, South Carolina, that "we ought to assume as a principle, that the neutrality of our territory should extend to the gulf stream which was a natural boundary." *Ibid.*

The several observations made above indicate the confusion

which existed in bygone years with respect to sovereignty over territorial ocean waters bordering the line of low tide on the sea coasts. However, the needs of nations to exercise jurisdiction over the waters along their coasts became increasingly important in the interest of self-defense, and the three-mile limit was informally accepted by the United States and Great Britain, while other countries claimed wider belts.

"* * * Thus far no international agreement has been reached on a uniform distance * * *. In the establishment of a rule of international law, two major principles must be respected: (1) the sovereignty of the coastal nation, and (2) the freedom of the high seas. The reconciliation of these two principles has been the stumbling block thus far. Perhaps the one point of agreement by all nations is that 3 miles is the minimum breadth, or, stating it differently, 3 miles is the one distance on which there is complete unanimity of opinion * * *." Shore and Sea Boundaries, Aaron L. Shalowitz, page 25.

While generally adhering to the doctrine of the freedom of the seas beyond the three-mile limit, the United States has, on numerous occasions, exercised authority beyond the limit, in the fields of law enforcement and national security. Congress has authorized federal officers to board vessels bound for the United States ports when within four leagues, or four nautical miles, of the coast for the purpose of determining the character of the cargo. Similar laws were enacted to enforce national prohibition.

The principle underlying the three-mile limit rule appears to be the attempted establishment of a "freedom of the seas" doctrine, the right of free navigation, and the right of free fishing on the high seas, which are recognized by some nations, including the United States, as rights belonging to all of the peoples of the world.

Furthermore, it has been American policy to establish national dominion over a definite marginal zone (the three-mile limit) to protect our neutrality against foreign nations.

The foregoing statement of governmental policy does not define limits of the continental United States, any more than do the various decisions of the Supreme Court of the United States in ruling upon the rights of states, as against the rights of the

federal government, to oil and minerals under the waters of the ocean within and beyond the three-mile limit; or the various laws enacted by the Congress of the United States known as the Submerged Lands Act, and the Outer Continental Shelf Lands Act. (Under the latter Act, the United States claims the right to oil beneath the continental shelf and beyond the three-mile limit.)

Every continent rests on a submarine base which extends seaward from the shore. This underwater extension on the part of the continent above sea level is called the "continental shelf." It has been defined as the submerged portion of a continent which slopes gently seaward from the low water line to a point under the sea where a substantial break in grade occurs, at which point the bottom slopes steeply until the great ocean depths are reached. The point or line of break defines the edge of the shelf.

It is common knowledge to the people of the United States that during the years of operation of the Submerged Lands Act, and the Outer Continental Shelf Lands Act, the government of the United States has received millions of dollars from leases of submerged lands beyond this three-mile limit on the continental shelf adjacent to the shore line of the United States.

It thus appears that the place where the boating accident in the instant lawsuit occurred, although a short distance beyond the three-mile limit, was above the continental shelf of the United States, and over lands which the 83rd Congress of the United States (Public Law 212, 67 Stats. at L. 462) declared subject to "the Constitution and laws and civil and political jurisdiction of the United States" for the purpose of "exploring for, developing, removing, and transporting resources therefrom, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State * * *."

It is our view that the language of the policy limiting the risk as to place as one occurring "within the Continental limits of the United States" is fraught with so much ambiguity that it is beyond reasonable definition. In the context in which it is employed, it could mean (1) within the three-mile limit; or, it could mean (2) beyond the three-mile limit, and over the "con-

tinental shelf'' (and perhaps at numerous other places unnecessary to explore here).

Therefore, first: resolving the ambiguous language against the insurance company to give effect to the dominant purpose of the policy, and, second: adopting one reasonable interpretation of the ''continental shelf'' theory which will give effect to the policy; and, third: strictly construing the policy against the insurer, and in favor of the insured; this court orders a judgment of affirmance.

We find no error committed by the trial court prejudicial to the rights of the appellant, the Motorists Mutual Insurance Company.

*Judgment affirmed.*

BRENNEMAN and HUNSICKER, JJ., concur.