**EMPLOYERS MUTUAL CASUALTY COMPANY, Appellant,**

v.

**Mrs. Eugene W. SAMUELS, Appellee.**

**No. 14460.**

Court of Civil Appeals of Texas.

San Antonio.

June 22, 1966.

Rehearing Denied Nov. 9, 1966.

Strasburger, Price, Kelton, Miller & Martin, Royal H. Brin, Jr., Robert K. Drummond, Dallas, for appellant.

Schweppe, Schweppe & Allison, Stahl & Sohn, San Antonio, for appellee.

CADENA, Justice.

This is a suit by appellee, Mrs. Eugene W. Samuels, against appellant, Employers Mutual Casualty Company, to recover for the death of her husband, Eugene W. Samuels, under a policy of insurance issued by appellant. Both parties filed motions for summary judgment and, after a hearing, the trial court entered judgment granting the motion of appellee and denying the motion of appellant. The judgment allowed appellee recovery in the sum of $11,952.01.

Samuels was an officer of a corporation which, as a subscriber to the Texas Workmen's Compensation Act, had obtained a policy of Workmen's Compensation and Employers' Liability Insurance from appellant. The policy contained a "voluntary compensation endorsement" which specifically covered Samuels. This endorsement amended the basic policy by adding thereto additional coverage, designated as "Coverage C," under which appellant agreed to pay, if Samuels sustained death or injury "under circumstances which would have rendered the insured liable for compensation if the injured employee and the insured had been subject to the workmen's compensation law * * * with respect to such employment, an amount equal to the compensation and other benefits which would have been payable under such law had the injured employee and the insured been subject to such law with respect to such employment."

Paragraph 3 of the voluntary compensation endorsement provided that the policy "applies under Coverage C only to injury or death sustained in the United States of America, its territories or possessions, or Canada."

On July 20, 1963, Samuels was required to make a business trip by airplane from San Antonio, Texas, the home office of his employer, to Brownsville, Texas. The airplane was owned by the employer and piloted by the employer's president. On the return trip from Brownsville to San Antonio, the aircraft crashed into the Gulf of Mexico, about twenty-one miles from the Texas coast, at a point between Port Isabel and the seaward edge of the so-called Outer Continental Shelf. The crash resulted in the death of Samuels.

Appellant contends that the trial court erred in rendering judgment against it, because, under the stipulations relating to the location of the fatal accident, Samuels did not sustain injury or die "in the United States of America, its territories or possessions."

A little more than 500 years ago it was frequently contended that the sea could be appropriated by a nation to the exclusion of all others. Vague and exaggerated claims were made by nations over portions of the sea, but gradually these "vain and extravagent pretensions," as they were called by Chief Justice Cockburn in Regina v. Keyn (1876), 2 Exch. Div. 175, were abandoned. See Hall, Treatise on International Law (8th ed., 1924), p. 189. Today, the generally accepted doctrine may be summed up as follows: The high sea does not form part of the territory of any nation. No nation can have over it any right of ownership, sovereignty or jurisdiction. At least in times of peace, no nation can claim to dictate laws for the high seas. The Mariana Flora, 1 Wheat. (U.S.) 1, 43, 6 L.Ed. 405; United States v. States of Louisiana, etc., 363 U.S. 1, 33, 80 S.Ct. 961, 4 L.Ed.2d 1025, 34th Report, Institute of International Law, pp. 101 et seq.

Article 2 of the Convention on the High Seas, adopted by the United Nations Conference on the Law of the Sea, held in Geneva in 1958 (U.N.Doc. A/CONF. 13/L. 53), declares that no nation may validly purport to subject any portion of the high seas to its sovereignty.

In the case of a littoral nation, a certain portion of the seas adjacent to its coasts is subject to its jurisdiction. The sea within this limit of territorial jurisdiction is generally referred to as "territorial waters," "the territorial sea," "the marginal sea" or "the maritime belt." The sea beyond the limits of these territorial waters is called the high sea and forms no part of the territory of any nation. Article 1, Convention on the High Seas.

While there is not universal agreement on the extent of a nation's territorial waters, the United States, along with Great Britain and other countries, has consistently adopted the three-mile limit. 1 Hackworth, Digest of International Law (1941), pp. 634–642.

Under these traditional concepts relating to national jurisdiction and sovereignty, it would follow that the fatal accident with which we are now concerned did not occur in the United States, its territories or possessions. However, appellee contends that, because of recent developments and claims advanced by various nations, including the United States, with reference to the so-called continental shelf, this accident, which occurred on the waters above such shelf, must be considered as having occurred within the United States, its territories or possessions.

The term "continental shelf" refers to the submerged bed of the sea, contiguous to a continental land mass, which is formed in such a manner as to be really an extension of, or appurtenant to, the land mass, but generally not situated at a greater depth beneath the sea level than 200 meters (100 fathoms). At approximately this depth there occurs, as a rule, the first substantial "fall-off" to the vastly greater ocean depths and submarine slopes. Because of technological advances in the art of oil drilling, making it possible to exploit submarine oilbearing strata found in these submerged lands, coastal nations have, especially within the past quarter-century, become vitally interested in these submarine areas.

In 1945 the President of the United States, 59 Stat. 884, by proclamation, declared that "the Government of the United States regards the natural resources of the soil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control." However, the Presidential Proclamation expressly recites that "[t]he character as high seas of the waters above the continental shelf and the right to their free and unimpeded navigation are in no way thus affected." 40 Am.J. of Int.Law(1946), Supp., pp. 45–46.

Subsequently, the United States Congress adopted the Submerged Lands Act (43 U.S.C.A. §§ 1301–1315) and the Outer Continental Shelf Lands Act (43 U.S.C.A. §§ 1331–1343). One of the primary purposes of these 1953 enactments was to settle a long-standing controversy concerning the respective rights of the Federal Government and the various States in the submarine areas off their shores. See United States v. State of California, 332 U.S. 19, 67 S.Ct. 1658; United States v. State of Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216; United States v. State of Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221. Cf. State of Alabama v. State of Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689.

The Submerged Lands Act recognizes the rights of each coastal State in the natural resources of the submerged lands off its shores out to its offshore boundary, subject to the constitutional powers of the United States in the fields of commerce, navigation, defense and international affairs. Under this statute, the seaward boundary of Texas, insofar as title to natural resources is concerned, is three marine leagues, or nine nautical miles, from the Texas coast line. United States v. States of Louisiana, etc., 363 U.S. 1, 80 S.Ct. 961.

The Outer Continental Shelf Lands Act,[1] insofar as pertinent here, is an assertion of Federal sovereignty. The Act first declares the policy of the United States to be that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition" as provided in the Act. 43 U.S.C.A., § 1332(a). Section 1333(a) (1) provides that the "Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon * * * to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State * * *."

■ Since the accident occurred twenty-one miles seaward from the Texas coast, it is apparent that it did not occur within the boundaries of the State of Texas. Those boundaries are established under the Submerged Lands Act at a point nine nautical miles, or 10.359 statute miles, seaward from the Texas coast. We conclude, further, that the death did not occur within the United States, its territories or possessions.

■ While the language of the Outer Continental Shelf Lands Act expressly amounts to an assertion of jurisdiction, the words make manifest that federal jurisdiction and control are extended only to the subsoil and seabed of the shelf, and to all artificial islands and fixed structures which may be erected thereon. The enactment explicitly disclaims, as did the Presidential Proclamation of 1945, any intention to affect the "character as high seas" of the waters above the shelf. 43 U.S.C.A. § 1333(a) (3).

If, as the Presidential Proclamation and the Outer Continental Shelf Lands Act

expressly recognize, these unilateral declarations of the United States concerning the subsoil and seabed of the shelf do not affect the status of the superjacent waters as "high seas," then it follows that the crash which took the life of Mr. Samuels occurred in an area which is the territory of no nation.

In Guess v. Read, 290 F.2d 622 (5th Cir., cert.den., 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed.2d 388), it was held that the crash of a helicopter about nine miles from the shore of the State of Louisiana did not occur within an area "over which the United States had declared its jurisdiction." The Court, in its consideration of the Outer Continental Shelf Lands Act, pointed out that such legislation does not include "the sea above the subsoil and seabed and does not include the air above the sea."

Our conclusion finds support in the provisions of the Convention on the Continental Shelf (U.N. Doc. A/CONF. 13/L. 55), adopted by the United Nations Conference on the Law of the Sea, April 29, 1958, and acceded to by the United States on April 12, 1961. Broadly speaking, this document recognizes and gives effect to the doctrine underlying the unilateral declarations by the United States and other nations asserting jurisdiction and control over the continental shelf and associated offshore areas, but its provisions stop short of acknowledging any unlimited jurisdiction by a littoral nation over shelf waters. While Article 2 of the Convention confers "sovereign rights" to the coastal nation over the continental shelf, it does so only "for the purpose of exploring it and exploiting its mineral resources." Article 3 declares that the rights of the littoral nation over the continental shelf "do not affect the status of the superjacent waters as high seas, or that of the air space above such waters."

The holding in Pure Oil Co. v. Snipes, 293 F.2d 60 (5th Cir.), on which appellee

---

1. The "outer continental shelf" is that portion of the shelf which lies beyond the seaward boundaries of the coastal states as established by the Submerged Lands Act.

relies, is in no way inconsistent with our holding here. In that case plaintiff sustained an injury when he fell from a rig onto the drilling platform erected over the continental shelf 65 miles from the Louisiana coast. The actual holding in Snipes, to the effect that the maritime law, rather than the law of Louisiana, was applicable to a cause of action arising out of the accident, cannot be construed as a holding that the place of the accident was within the United States, since the Court expressly said: "In every sense of the word this happened on the high seas." 293 F.2d at p. 64. In any event, the accident in Snipes occurred on a "fixed structure" erected on the continental shelf. As already pointed out, the Outer Continental Shelf Lands Act extends the "Constitution and laws and civil and political jurisdiction of the United States" to "fixed structures" which may be erected on the shelf "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State * * *." The Act contains no similar assertion of complete jurisdiction to the superjacent waters.

It is true that the United States Coast Guard is authorized to make and enforce safety regulations concerning the structures and "waters adjacent thereto." 43 U.S.C.A. § 1333(a) (3) (e) (1), (2). But this is a far cry from that assertion of exclusive jurisdiction which would have the effect of making the waters over the shelf a "territory" or "possession" of the United States. This provision merely reflects that Congress, cognizant of the fact that the erection of artificial islands and other structures on the surface waters would necessarily present dangers to navigation and to persons working on such structures, desired to insure that appropriate measures would be taken to minimize such hazards. Paragraph 3 of Article 5 of the Convention on the Continental Shelf confers to the maritime nation authority to construct on the shelf installations necessary for the exploration and exploitation of the minerals of the submarine lands, to establish safety zones around such structures and to take, in such zones, measures necessary for their protection. But paragraph 3 of that Article declares that such safety zones may extend to a distance of 500 meters around such installations, and paragraph 4 explicitly states that such installations shall not have the "status of islands," and that such installations, although under the jurisdiction of the coastal state, have no "territorial sea of their own," and their presence "does not affect the delimitation of the territorial sea of the coastal state."

It thus appears that the Presidential Proclamation of 1945 and the 1953 Federal legislation relating to the continental shelf do not amount to that assertion of sovereignty, at least insofar as the superjacent waters of the continental shelf are concerned, which would have the effect of transforming such waters from their status as high seas into a status as territories or possession of this country. Cf. United Nations Secretariat, Memorandum on the Regime of the High Seas (1950), p. 81 (U.N. Doc. No. A/CN. 4/32).

We do not believe that the geographical limitation on coverage contained in the policy under which appellee claims is so worded as to create ambiguity, when an effort is made to apply it to an accident which occurred twenty-one miles off the Texas coast. Cf. Snyder v. Motorists Mutual Ins. Co., 2 Ohio App.2d 19, 206 N.E.2d 227.

The transcript in this case contains a stipulation by the parties that "the only issue in this case is whether the injury or death of Eugene W. Samuels was sustained in the United States of America, its territories or possessions, or Canada." In view of this stipulation, we do not consider the contention of appellee that the geographical limitation of coverage is invalid because in conflict with Sec. 19 of Article 8306, Vernon's Ann.Civ.St. Nor do we, in view of such stipulation, express any opinion on the question of whether such geographical limitation should be construed as being applicable to a situation where, as here, the

injured employee strayed, unwittingly, outside the United States, its territories or possessions, while in the course of a journey between two points in Texas, and while flying in what appears to be a direct route between the two Texas points.

Since both appellee and appellant filed motions for summary judgment and we have held that the trial court erroneously granted appellee's motion for summary judgment, we are authorized to review the action of the trial court in overruling appellant's motion for summary judgment and enter the judgment which the trial court should have rendered. Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396 (1958); Rule 434, Texas Rules of Civil Procedure. In view of the stipulation to which reference has been made, coupled with our conclusion that, as a matter of law, the injury resulting in the death of Mr. Samuels did not occur within the United States, its territories or possessions, it necessarily follows that the appellant's motion for summary judgment should have been granted.

The judgment of the trial court is reversed and judgment is here rendered granting appellant's motion for summary judgment and ordering that appellee take nothing by her suit.

## On Motion for Rehearing.

In her motion for rehearing appellee calls our attention to Article 5415a, Vernon's Ann.Civ.St., which, as originally passed in 1941, declared that the seaward boundary of the State of Texas was located at a point in the Gulf of Mexico twenty-seven marine miles from the Texas coast. Acts 1941, 47th Leg., p. 454, Ch. 286, § 1. In 1947 the Legislature amended Article 5415a by extending the marine boundary of this State to the outer edge of the Continental Shelf. It is appellee's contention that, in view of this legislation, the accident in question, which occurred on the waters above the Continental Shelf, took place within the United States of America within the meaning of Paragraph 3 of the voluntary compensation endorsement.

Section 2 of the statute declares that "[s]ubject to the right of the government of the United States to regulate foreign and interstate commerce under Section 8 of Article 1 of the Constitution of the United States, and to the power of the United States over cases of admiralty and maritime jurisdiction under Section 2 of Article 3 of the Constitution of the United States," Texas has "full sovereignty" over all the waters of the Gulf of Mexico within the boundaries fixed by the statute. Section 3 asserts that Texas owns, "in full and complete ownership," such waters and the lands covered thereby.

In United States v. State of Louisiana, 339 U.S. 699, 705, 70 S.Ct. 914, 917 (1950), the Supreme Court of the United States, speaking of state statutes purporting to extend the seaward boundaries of the states, said: "We intimate no opinion on the power of a State to extend, define, or establish its external territorial limits or on the consequences of any such extension vis a vis persons other than the United States or those acting on behalf of or pursuant to its authority." Appellee contends that, since this case involves no dispute between appellee and the United States of America, Article 5415a controls the disposition of this case.

Appellee further relies on City of Galveston v. Menard, 23 Tex. 349 (1859), where the Texas Supreme Court, in a case involving a dispute concerning ownership of certain lands in the Gulf of Mexico, considered the effect of the 1836 act of the Congress of the Republic of Texas, which established the seaward boundaries at a point in the Gulf three leagues from the coast. 1 Gammel's Laws 1193. Justice Roberts used the following language:

"* * * This claim of the Republic upon her coast may not have been admitted by other nations, further than one marine league from the shore. * * * That would very much have depended upon her power to enforce her claims,

as we have seen in the case of the British seas and the Danish sound. * * * But as between her own citizens, in respect to the rights of the soil, which they might respectively acquire, the boundaries, prescribed and proclaimed by the government, is conclusive. * * *" 23 Tex. at pp. 391–392.

■ Article 5415a is, on its face, an attempt by the State of Texas to acquire new territory, since prior to 1941 this State's historical claim extended only three marine leagues into the Gulf. Appellee's theory is that Art. 5415a necessarily has the effect of making the waters and lands included within the extended boundary a part of the United States.

■ The power to acquire new territory and annex it to the United States so that it becomes a part thereof rests in the federal government. 1 Willoughby, Constitutional Law of the United States (2d ed., 1929), 407–425; Burdick, Law of the American Constitution (1922), 272–282; Wright, The Control of American Foreign Relations (1922), 129–134. According to some authorities, this right passed by implication with the grant of the treaty-making and war powers. The treaty power gives authority to acquire new territory by cession, while the war power carries the right to acquire it by conquest. American Ins. Co. v. Canter, 1 Pet. 511, 7 L.Ed. 688 (U.S., 1828); Stewart v. Kahn, 11 Wall. 493, 20 L.Ed. 176 (U.S.1870); United States v. Huckabee, 16 Wall. 414, 21 L.Ed. 457 (U.S.1872); Jones v. United States, 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890); De Lima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901). Another explanation is that the power rests in the federal government as an attribute of sovereignty. Sere v. Pitot, 6 Cranch 332, 3 L.Ed. 240 (U.S., 1810). See United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); 1 Willoughby, op. cit., 206

It is difficult to understand how the State of Texas, by its unilateral act and without the consent of the federal government, can extend the boundaries of the United States. It is true that, to some extent, a State may, by legislation, exercise its authority over its own citizens on the high seas. Thus, in Skirotes v. State of Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941), the Supreme Court of the United States upheld Florida legislation prohibiting the use of diving equipment for taking sponges in the Gulf of Mexico within nine nautical miles of the Florida coast. It is significant to note that Congress had, in 1868, approved Florida's claim to a seaward boundary located three leagues from the Mainland. United States v. States of Louisiana, Texas, Mississippi, Alabama and Florida, 363 U.S. 121, 80 S.Ct. 961, 4 L.Ed.2d 1096 (1960). It is also clear from the Skirotes opinion that the result there was not based on the fact that the Florida claim had the effect of making the waters beyond the three-mile limit territorial waters of the State of Florida, or of the United States. Mr. Chief Justice Hughes said: "We are not unmindful of the fact that the statutory prohibition refers to the 'Gulf of Mexico, or the Straits of Florida or other waters within the territorial limits of the State of Florida.' But we are dealing with the question of the validity of the statute as applied to appellant from the standpoint of state power. The State has applied it to appellant at the place of his operations and if the State had power to prohibit the described conduct of its citizen at that place we are not concerned from the standpoint of the Federal Constitution with the ruling of the state court as to the extent of territorial waters. The question before us must be considered in the light of the total power the State possesses." 313 U.S. at p. 79, 61 S.Ct. at 930.

Clearly, then, Skirotes is based on the power of a State to control the conduct of its citizens, and not on the power of the State to annex territory and thus extend the boundaries of the United States.

Paragraph 2 of the preamble of the 1941 version of Article 5415a, and the emergency clause of such original act (Sec. 5), make evident that the purpose of the boundary extension was the protection of rights of Texas citizens to fish and take natural re-sources from the waters, and to reserve the rights of the Permanent Free School Fund to any oil-bearing lands within the extend-ed boundaries. Acts, 1941 Leg. p. 454, ch. 286. The statute itself contains no provi-sions regulating the conduct of Texas citi-zens. Even if we should be inclined to hold that appellant, which is described in the stipulations as Mutual Casualty Company of Des Moines, Iowa, is a citizen of Texas, we would not have a situation in which the State of Texas is exercising its power to regulate the conduct of its citizens on the high seas with respect to insurance matters.

Article 5415a, insofar as it attempts to extend the boundaries of Texas beyond the three-league limit and to assert the owner-ship of the State in the waters and sub-merged lands beyond that limit, is incon-sistent with the provisions of the Sub-merged Lands Act, 43 U.S.C.A., §§ 1301–1315. As pointed out in the original opin-ion herein, the effect of such legislation was to fix the boundary of Texas at three marine leagues from the Texas coast. The following language from the opinion in United States v. States of Louisiana, etc., 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960), is pertinent: "The power to admit new States resides in Congress. The Pres-ident, on the other hand, is the constitution-al representative of the United States in its dealings with foreign nations. From the former springs the power to establish state boundaries; from the latter comes the power to determine how far this country will claim territorial rights in the marginal sea as against other nations. Any such determination is, of course, binding on the States. * * * It is sufficient for pres-ent purposes to note that there is no ques-tion of Congress' power to fix state land and water boundaries as a domestic mat-ter." 363 U.S. at p. 35, 80 S.Ct. at p. 982.

Whatever may be the effect of Art. 5415a, from the viewpoint of the power of the State of Texas to regulate the conduct of its citizens beyond the three-league limit, we cannot rely on that statute as a basis for holding that the airplane which carried Mr. Samuels to his death crashed "in the United States of America." We need not decide whether Texas can claim title to land which is not within the territorial limits of the United States. But it would certainly be an anomaly for this Court to hold that the waters above the continental shelf are within the United States, its terri-tories or possessions when the United States has consistently maintained the position that such waters are part of the high seas and, therefore, subject to the control of no nation.

The motion for rehearing is overruled.